**In the Matter of UNISHOPS, INC., et al., Debtors.**

**No. 73 B 1208.**

United States District Court, S. D. New York.

July 25, 1975.

Levin & Weintraub, New York City, for debtors; by Elias Mann, Daniel A. Zimmerman, New York City, of counsel.

Ruben, Schwartz & Silverberg, New York City, for claimants; by Seymour J. Silverberg, Albert Lyons, New York City, Michael Goldsmith, of counsel.

MEMORANDUM

FRANKEL, District Judge.

The undisputed facts and the legal issues are amply stated in the opinion of Bank-

ruptcy Judge Babitt.* It is feasible and appropriate, therefore, to record with relative brevity, and in the order of Judge Babitt's treatment, the grounds of affirmance on the major claim, reversal on the second, and a remand on the third.

■ 1. *Claim No. 2304.*—The court agrees with Judge Babitt that, despite differences in nonessential detail, the explicit principles of *In the Matter of Grayson-Robinson Stores, Inc.,* 321 F.2d 500 (2d Cir. 1963), control here. The resolution of this claim is directed by *Grayson-Robinson's* essential, and unhedged, holdings; first, that a contract of guaranty is not executory because it holds no future benefit for the guarantor, and, second, that special facts arising out of the guarantor's relationship to the lessee were of no moment. With deference in every direction, I am not prepared to share the Bankruptcy Judge's reservations about that decision. It is by no means self-evident that a lease of a nonbankrupt lessee, which is not able to disaffirm, is an asset of that lessee itself, let alone an asset of a guaranteeing parent corporation. It is not more evident that the claimant-lessor allowed the subsidiary to remain in possession, though in default, upon the strength of the disputed contract of guaranty—surely a strange course of forbearance in light of the guarantor's presence in the bankruptcy court under the seemingly ample shadow of the *Grayson-Robinson* precedent. Despite the references to "equitable principles" and contrary views of a respected academic commentator, it is not clear at all that the decision in *Grayson-Robinson* fails to assess accurately and justly the claims of competing creditors.

In any event, along with Judge Babitt, and upon his sound analysis of what the case must be deemed to have held, I conclude that *Grayson-Robinson* commands rejection of Claim No. 2304.

■ 2. *Claim No. 3.*—In determining this claim, the Bankruptcy Judge did not have the benefit of two pertinent decisions, one dated a day before, the other a month or so after, Judge Babitt's opinion. Under older precedents it was arguable that a debtor-in-possession should not be deemed an occupant of premises because they are held by subtenants under a sublease made before the Chapter XI proceeding. See *Central Manhattan Properties v. D. A. Schulte, Inc.,* 91 F.2d 728 (2d Cir. 1937); *In re McCrory Stores Corp.,* 69 F.2d 517 (2d Cir. 1934); *In re United Cigar Stores Co.,* 69 F.2d 513 (2d Cir. 1934); *Irving Trust Co. v. Densmore,* 66 F.2d 21 (9th Cir. 1933); *Meehan v. King,* 54 F.2d 761 (1st Cir. 1932). For, even before last year, it appeared that a decisive separation was affected by entry into Chapter XI, whereupon the debtor-in-possession is to "have all the title and exercise all the powers of a trustee . . . ." Bankruptcy Act § 342, 11 U.S.C. § 742 (1970); see *American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S. A.,* 280 F.2d 119, 124–25 (2d Cir. 1960); *Central Manhattan Properties v. D. A. Schulte, Inc.,* 91 F.2d 728, 729 (2d Cir. 1937). But if there was a missing link in the chain of reasoning to that conclusion, it was supplied when, in circumstances more perplexing for this point than are the facts of this case, the Second Circuit affirmed that "[a] debtor-in-possession under Chapter XI . . . is *not* the same entity as the pre-bankruptcy company." *Shopmen's Local Union No. 455, etc. v. Kevin Steel Prod., Inc.,* 519 F.2d 698, 704 (2d Cir. 1975). Consequently, contracts of the pre-bankruptcy entity are not contracts of the debtor-in-possession, until or unless assumed. Id. at 704. Within weeks, another panel, in an analogous case, reaffirmed the character of a "debtor-in-possession . . . as a new judicial entity." *Brotherhood of Railway, etc. v. REA Express, Inc.,* 523 F.2d 164, 170 (2d Cir. 1975), cert. denied, 423 U.S. 1017, 95 S.Ct. 451, 46 L.Ed.2d 388 (1975).

In sum, as the precedents now stand, it seems plain that Claim No. 3 should be disallowed, as occupation by a sublessee of a debtor is not to be construed as occupation by the debtor-in-possession.

* Appended hereto as an Appendix.

3. *Claim No. 2305.*—The decision below on Claim No. 3 made it unnecessary to reach this remaining subject. In the changed posture, it may require another look, though this is probably of no consequence. It is apparently conceded that Unishops collected no rents from sublessees in the period from September 3 to September 23, 1974. Moreover, the claimant's entitlement to rents thereafter from the sublessees is proclaimed in Judge Babitt's order of the latter date allowing Middletown to disaffirm. Nevertheless, insofar as there may be open questions on this topic not now disclosed in the record, these are left for handling by Judge Babitt on the remand.

In sum, the decision below is affirmed as to Claim No. 2304, reversed as to Claim No. 3, and remanded on Claim No. 2305 for further proceedings if any should be required.

It is so ordered.

## APPENDIX

## OPINION

ROY BABITT, Bankruptcy Judge.

The controlling facts have been agreed upon in this dispute between this Chapter XI debtor and one of its creditors on the proper legal basis to be accorded the three claims formally proved by that creditor. Those facts may be summarized as follows:

Whites at Middletown, Inc., owner-developer of property known as the Middletown Shopping Center located near Route 211, East Middletown, New York, executed a long-term lease with Middletown Center, Inc., as lessee on July 1, 1970. Between that date and September 24, 1970, Middletown Center, Inc. became a wholly-owned subsidiary of Unishops, Inc. On September 24, 1970, claimant, 143 Estates, Inc., became fee owner of the Middletown Shopping Center. As a condition of its acquisition of the fee interest, 143 Estates, Inc. secured from Unishops, Inc. its guarantee of the July 1 lease between the latter's subsidiary, Middletown Center, Inc. and the former as successor lessor.

On November 3, 1973, the parent, Unishops, filed its petition for an arrangement pursuant to the statutory scheme of Chapter XI of the Bankruptcy Act, Sections 301 *et seq.*, 11 U.S.C. §§ 701 *et seq.*[1] In the intervening period between this filing and September 23, 1974, Unishops in no way altered, questioned, or sought to disaffirm its guarantee of its subsidiary's lease. The subsidiary, itself a petitioner for Chapter XI relief on September 3, 1974, remained in possession at least until that date. (Following September 3, the parties disagreed over the period including September 23, as will be seen.)

On September 3, Unishops' subsidiary, as lessee, sent the keys to the claimant, as lessor, by mail with a covering letter manifesting an intent to give up possession and the lease. However, the property in question continued to be occupied by sub-lessees of Unishops' subsidiary from September 3 (when its Chapter XI petition was filed) until the 23rd, a period of twenty days. On September 23 this court entered an order authorizing disaffirmance of that lease pursuant to the terms of Section 313(1) of the Act, 11 U.S.C. § 713(1). That order became final without review. However, the disaffirmance gave the claimant-lessor the right to file a claim based on that fact. *In re Miracle Mart, Inc.,* 396 F.2d 62 (2d Cir. 1968).[2] And so, claimant filed 3 separate claims. Two were filed against the parent, Unishops, and were assigned numbers 2304 and 2305 on this court's claims dockets; one was filed against the subsidiary involved in this dispute and was assigned number 3 on the claims docket relating to that debtor. Bankruptcy Rule 504(a), 411 U.S. 1055, 93 S.Ct. 3137, applicable to Chapter XI cases

---

1. Unishops' petition was filed under Section 322, 11 U.S.C. § 722, as an original petition as no prior proceedings under the Bankruptcy Act were pending. Compare Section 321, 11 U.S.C. § 721.

2. In any event, claims in Chapter XI could be filed up to the order of confirmation, and under the circumstances described in Section 355(1), as amended in 1967, 11 U.S.C. § 755a(1), beyond that period.

by Rule 11–60, 415 U.S. 1037. This dispute centers on the propriety of those claims. They will be dealt with separately.

In claim No. 2304 filed against Unishops, the claimant resists that debtor's efforts to denigrate the legal status of the claim and insists that rent owed it by Unishops' subsidiary from March 1, 1974 to September 23, 1974, a total of $417,000.47, is an administration expense of Unishops, as guarantor, pursuant to the guarantee agreement referred to above.

In claim No. 3 filed against the subsidiary, the claimant asserts that the unpaid rent from September 3 to September 23, 1974, $42,050.00, is an administration expense of the subsidiary, its lessee.

In claim No. 2305 filed against Unishops, claimant seeks rentals allegedly collected by Unishops in September, 1974. The difference between holding these claims to be entitled to administration status, as claimant urges, and something less, as the debtors assert, is real and meaningful. If the former, they must be paid in full on confirmation as incidents of the periods following the filing of the Chapter XI petitions by Unishops and later by this subsidiary. Section 337(2) of the Act, 11 U.S.C. § 737(2), and Rule 11–38(a)(2), 415 U.S. 1028, read with Sections 357(6) and 361 of the Act, 11 U.S.C. §§ 757(6) and 761. If something less, i. e., general claims, they share with other similarly placed creditors in the amounts promised in the arrangements.

The issue thus presented to resolve the dispute on claim No. 2304 is whether a guarantee of a lease is an executory contract, which, never having been rejected by the parent Unishops, as guarantor, pursuant to Section 313(1), 11 U.S.C. § 713(1), means that a claim based on such guarantee is a valid expense of the Chapter XI administration of Unishops' case and is therefore to be paid in full. Here the claim on Unishops' guarantee is grounded in the nonpayment of rent by the subsidiary after Unishops filed its Chapter XI petition, but before the subsidiary filed its own and for 20 days after. Resolution of this question seems to be squarely controlled by the continuing vitality of the holding of the Court of Appeals for this Circuit in *In the Matter of Grayson-Robinson Stores, Inc.*, 321 F.2d 500 (1963). The instant dispute thus does not present a slate free of prior judicial instruction, and my duty as in inferior court is to apply, as best I can, the legal gloss placed on identical facts by my superiors. See *United States v. A Motion Picture Film Entitled "I am Curious Yellow,"* 404 F.2d 196 (2d Cir. 1968), Friendly, *C. J.,* concurring at 200.

In *Grayson-Robinson*, as here, the parent guarantor executed a guarantee of its subsidiary's lease before the parent filed its Chapter XI petition but was called upon to make good on the subsidiary's default after the petition. There, as here, the subsidiary continued to operate under its lease during the period after its parent-guarantor's Chapter XI petition. There, as here, the question presented to the Court of Appeals was whether or not a guarantee of a lease could be considered executory because of the guarantor's interest in the future performance of the lease by the independent subsidiary's lessor. En route to holding in the negative the court said:

"The situation for which the statute provides [§ 313(1) disaffirmance of executory contracts] is one in which, in making a determination whether or not to reject, the advantages of giving and receiving further performance are to be weighed against the disadvantages. A guarantor of a lease has no interest in the lessor's future performance. Such an agreement of guaranty is not in itself any part of a bargain . . .. The guarantor, by the lessor's execution of the lease, has received all of the consideration for which he bargained with the lessor." 321 F.2d at 502.

Hence, as this Circuit saw it in *Grayson-Robinson*, the crucial test was whether the Chapter XI debtor, as guarantor of the lease, retained any interest in the future performance by the lessor who insisted on the guarantee (the claimant here) where such interest was *bargained for by the guarantor as part of the agreement of*

*guarantee.* The court in *Grayson-Robinson* seems to have minimized the realities of the independent interest which a guarantor would have in a lessor's future faithful performance of its lease with the subsidiary of the parent as lessee. This declination by the court to consider an independent interest of the guarantor beyond the mere bargained for guarantee agreement has been adversely commented on by Harvard Professor Vern Countryman in Part I of his *Executory Contracts In Bankruptcy*, 57 Minn.L.R. 439, 452–54 (1973). It would not, I think, be amiss for me to suggest a focus to the problem which might, perhaps, support a reappraisal of *Grayson-Robinson.* That focus is on the inter-relationship between executory contracts and expenses of the Chapter XI administration as a super priority within the salutary purpose of that rehabilitative Chapter in the national scheme for business insolvency.

I start with the central theme of the Bankruptcy Act to secure equality among creditors and to prevent preferences between them. *Sampsell v. Imperial Paper & Color Corp.,* 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293 (1941); 3 *Collier on Bankruptcy* (14th ed.) ¶ 60.01. Expenses of the Chapter XI period are given priority under Section 337(2) of the Act, 11 U.S.C. § 737(2), because "the cost of preserving the estate is in the interests of every creditor." *In re Halsey Elct. Generator Co.,* 175 F. 825, (D.C.N. J.1909) affirmed *sub nom. State of N. J. v. Lovell,* 179 F. 321 (3rd Cir. 1910); 3 *Collier on Bankruptcy* (14th ed.) ¶ 62.14. I do not mean to imply that only those expenses which preserve the estate are administration expenses. However, as will soon become apparent, preservation is the key element to an understanding of the status of the continued liability by Chapter XI debtors under non-rejected executory contracts. Such liability is given administration status. So much is not questioned.

Whatever may have been Congress' purpose in enacting the provision for rejection of executory contracts, Section 313(1), 11 U.S.C. § 713(1), the legislative history carries no hint of it. *In the Matter of Business Supplies Corp. of America,* 48 Amer.Bankruptcy L.J. 108 (S.D.N.Y.1973). I can only assume that in writing Section 313(1), Congress was following a rule already developed by judicial decision. The judicial origins of the rule first grew out of the doctrine of abandonment, *Executory Contracts In Bankruptcy, supra,* at 444. Under this doctrine, the trustee was held not to be bound to accept property which might prove to be onerous or unprofitable. *Donaldson v. Farwell,* 93 U.S. 631, 634, 23 L.Ed. 993 (1876); *Claflin v. Houseman,* 93 U.S. 130, 135, 23 L.Ed. 833 (1876). This doctrine was extended and gave equity receivers leave to reject unprofitable leases and contracts. *U. S. Trust Co. v. Wabash Western Ry.,* 150 U.S. 287, 299, 300, 14 S.Ct. 86, 37 L.Ed. 1085 (1893). Simply stated, the receiver could look at the executory contract as a potential asset which, if found to be of no benefit, could then be abandoned, including the receiver's right to insist on performance by the other party. Since the right to insist on that future performance is property, an asset, as it were, of the estate, it makes sense to treat compliance with the terms of the contract by the Chapter XI debtor as an administration expense until disaffirmed under Section 313(1). Manifestly, if continued performance enhances the debtor, it is in the interest not only of the debtor, but also of all the creditors. The fact that the interest in future performance was not specifically bargained for does not make it any less an asset of the debtor; nor are the creditors' interests in the revitalizing debtor any less. Thus, the appropriate rule should take into account that an executory contract may be one in which the debtor has a continuing interest in its future performance, and that that contract is considered an asset of the debtor's estate which, unless disaffirmed under Section 313(1), requires performance by the debtor regardless of what was bargained for in the agreement.

An examination of the facts at bar demonstrates the extent to which *Grayson-Robinson,* ignoring this focus, effectuates a result at war with settled principles of equity, which, we have been reminded again and

again, is the touchstone of bankruptcy administration. *Bank of Marin v. England,* 385 U.S. 99, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966). The guaranteed lease here is clearly an asset of the subsidiary lessee. It cannot be less an asset of the parent-guarantor. The parent surely has an interest in the future performance by the claimant, the lessor of the subsidiary's lease. Can it be said that Unishops, as parent, had no interest in its child's lease where that lease was a valuable asset of the child thereby contributing to its net worth? When, on March 1, 1974, the subsidiary lessee experiencing difficulty, begins to default, the parent-guarantor's interest becomes apparent for its subsidiary continues to remain in possession of the Middletown Shopping Center, and continues to collect rents from its sub-lessees. That income, undiminished by payments of rent due the subsidiary's lessor, enhances the parent's assets. It simply cannot be accepted that the lessor (claimant here) would have permitted the subsidiary lessee to remain in possession and continue its defaults for six months were it not for the guarantee of the parent guarantor to make the defaults good. In effect, then, *Grayson-Robinson* would permit a parent-guarantor to continue to derive the ultimate benefits of continued possession by its defaulting subsidiary based wholly on the lessor's reliance on the agreement of guarantee, but without responsibility to pay. It would be far more equitable to concede the parent-guarantor's interest in the future performance by the claimant lessor of its promises in the lease with the subsidiary. The guarantee should clearly be an executory contract within the meaning of Section 313(1) of the Act and in effect, until disaffirmed. That guarantee would therefore be a continuing obligation of the parent guarantor from its Chapter XI filing through its subsidiary's defaults, and until the guarantee agreement is disaffirmed. There is no prejudice to the parent's creditors. Rejection of the guarantee by the guarantor at the time of its subsidiary's default would not necessarily result in rejection of the obligation, for under Section 353 of the Act, 11 U.S.C. § 753, a rejection puts the claimant in the position of general creditor for the damages resulting from the rejection. *In re Miracle Mart, supra.* On default by the subsidiary, the parent-guarantor could make its election either to disaffirm or to continue the guarantee contract. The claimant, the subsidiary's lessor, should be allowed administration expenses for allowing the defaulting subsidiary to remain in possession. Should the guarantee be disaffirmed, the lessor could proceed to recover the leased property from the defaulting subsidiary. If the subsidiary, unprotected by its parent's guarantee, should, therefore, file its own Chapter XI petition, as was done here, the landlord would still have certain remedies to recover the premises, *In re Overmyer,* 510 F.2d 329 (2d Cir. 1975), or could assert a claim for unpaid Chapter XI use and occupancy and thereby become entitled to administration status.

The parent insists, however, that it should not be treated any worse than its subsidiary. Since, the argument runs, the claimant lessor has only a general claim against the subsidiary, as lessee, as the defaults predate the subsidiary's own Chapter XI petition, that claimant should not have a priority claim against the subsidiary's guarantor. The short answer to this contention is that the parent, as guarantor has received a benefit following its Chapter XI for which it should pay administration expenses. That benefit consists of the undisturbed occupancy of the subsidiary. It is no answer to say that the defaults would be given general claim status if the subsidiary files its own petition for, the point is, the parent's guarantee may have the benign effect of making it unnecessary for the subsidiary to file. The difference in treatment results from the difference in position, and that difference may even survive bankruptcy under Section 16 of the Act, 11 U.S.C. § 34.

A final word must be added about *Grayson-Robinson.* As the court itself appreciated there:

"the question certified (is the guarantee of a lease an executory contract) is meaningless apart from concretization

based on the specific facts of the particular situation. In order to determine with confidence whether any particular contract is to be considered executory within the meaning of Section 313(1), we must know why the question is asked and what would be the consequences of the answer 'yes' or the answer 'no.'" 321 F.2d at 502.

The opinion goes on to comment on the scant record.[3]

Perhaps, a fuller record might have constrained the court to depart from the general rule that agreements of guarantee are non-executory, as in *In re Schulte Retail Stores Corp.*, 105 F.2d 986 (2d Cir. 1939); and *Hippodrome Bldg. Co. v. Irving Trust Co.*, 91 F.2d 753 (2d Cir. 1937), *cert. denied*, 302 U.S. 748, 58 S.Ct. 265, 82 L.Ed. 578 (1937). But those cases did not have the facts here involving a Chapter XI parent, and a defaulting subsidiary which later seeks the relief of that Chapter.

However the rule of *Grayson-Robinson* constrains me to hold that the agreement of guarantee is non-executory, and is a complete obligation effective on the date of execution. *In the Matter of Wolf Rechtman, Bankrupt*, 29 Am.B.R. (N.S.) 756, 760 (E.D.N.Y.1935). Perhaps, the facts in the instant case will support a further look at the question in light of the realities of these debtors and many like them. In any event, having been executed by the parent before it filed its petition, the guarantee can have no higher status than that of a general claim.

The claimant lessor, citing *Maynard v. Elliott*, 283 U.S. 273, 51 S.Ct. 390, 75 L.Ed. 1028 (1931), gamely seeks to distinguish *Rechtman* by arguing in this case that, at the date of execution, the lease was not a provable claim under Sections 63(a)(8) and 57(d) of the Act, 11 U.S.C. §§ 103(a)(8) and 93(d). The argument is without merit. Under Section 57(d) of the Act, contingent contractual liabilities are provable pursuant to Section 63(a)(8) of the Act only if subject to *liquidation* or *estimation*. The question is for the sound discretion of the court, considering all the circumstances, taking into account particularly the probable direction of the process of liquidation as compared with the period of future uncertainty due to the contingency in question. 3 *Collier on Bankruptcy* (14th ed.) ¶ 63.60; *Maynard v. Elliott, supra.* The question then becomes a practical one. Here the contingent contractual liability resulting from the guarantee is capable of and in fact has completely been set by the very claim interposed by the claimant for rent covering the period, March 1 to September 23, 1974. Such claim is provable and fixed as an obligation at the date of the execution of the contract. *In re Rechtman, supra.* Accordingly, Unishops' objection to claimant's classification of Claim No. 2304 as an administration claim is sustained.[4]

In examining Claim No. 3, the court agrees with the debtor that any claim for unpaid rent under a lease is an administration expense between the period of the Chapter XI filing and the disaffirmance of the lease, but only to the extent the debtor's estate is benefitted. Support is claimed for this in *American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene*, 280 F.2d 119 (2d Cir. 1960).

Unishops' subsidiary argues with great vehemence, that its mailing of the keys to the claimant on September 3, 1974 constituted a voluntary acceptance by the latter of the surrender of the premises. Therefore, the subsidiary goes on, it received no benefit for which it should be liable as an administration expense. On the facts here, however, the argument fails.

---

**3.** It is surprising that the debtor Unishops does not press the apparently controlling effect of *Grayson-Robinson* even though its counsel was (involved) in that case. The case is cited for the proposition that its rationale does not apply here, a reading which, I think, largely ignores what the court said and what the language implies.

**4.** This decision calls for no more under Section 57(k) of the Act, 11 U.S.C. § 93(k), than the proper classification in law now; the parties have reserved the right to litigate later, if necessary, the quantum of the claim.

It is true that, generally, the voluntary acceptance of premises by a landlord is binding. So much is well settled under New York law, and the surrender of keys may indeed constitute such voluntary acceptance by the landlord, thereby terminating the lease. *Zimmer v. Diamond*, 268 App.Div. 539, 52 N.Y.S.2d 131 (1944). However I do not find that, under the evidence here, the mailed keys were voluntarily received by the claimant, and, accordingly, the lease was not terminated on September 3, 1974 when Middletown Center, Inc. filed its own petition for Chapter XI relief.

Moreover, under New York law, the continued occupation of Middletown's sub-lessees must be considered continued occupation by Middletown as lessee. *214 W. 39th St. Corp. v. Miss France Coats*, 274 App.Div. 597, 84 N.Y.S.2d 818 (1948). But this excursion into New York law is not really necessary to resolve a legal dispute on which both sides agree. However, the debtor presses the *American Anthracite* case to defeat the claim, and so I turn to it. No benefit actually inured to the debtor there for it had only the right to, but not actual possession. Here, Unishops' subsidiary, as sub-lessor had actual possession through its sub-lessees who were liable to it for their occupancy. This right to collect the rents clearly constituted benefit and the rule of *American Anthracite* is satisfied. Accordingly, Claim No. 3 for the period from September (when Middletown's Chapter XI petition was filed) until September 23 (when the lease with claimant was rejected) is entitled to administration status.

Its quantum must now be fixed. Since I have been given no evidence by the subsidiary to the contrary, the rate of rental under its lease with claimant must be presumed to be reasonable; and the benefit conferred by the collection of sub-rents does not suggest otherwise. *Palmer v. Palmer*, 104 F.2d 161 (2d Cir. 1939), *cert. denied*, 308 U.S. 490, 60 S.Ct. 120, 84 L.Ed. 494 (1939), 4A *Collier on Bankruptcy* (14th ed.) ¶ 70.44.

I therefore conclude that the claim based on the rent due claimant from Middletown Center, Inc., for the period from September 3rd to the 23rd, 1974 is to be given administration status. Of course, it follows, that that debtor is entitled to all rents due from the sub-lessees for this period. This is dispositive of Claim No. 2305 and the debtor's objection to that claim is sustained.

Submit order in conformity with this decision.